## Case No. 4,585.

The E. W. GORGAS.

[10 Ben. 460.] [1]

District Court, S. D. New York. June, 1879.

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

E. D. McCarthy, for libellants McGovern and Joice. W. R. Beebe and F. A. Wilcox, for libellant Harrigan. R. D. Benedict, for claimant.

CHOATE, District Judge. These are three suits brought by the owners of three barges to recover damages for the loss of the barges and their cargoes, alleged to have been caused by the negligence and mismanagement of those in charge of the steam-tug, while the said barges were with other boats

being towed from Port Morris to Bridgeport, Conn., on the 13th of March, 1879. The claimant, George H. Dentz, after answering in each case to the merits, set up as a separate defence, "that on the 19th of March, 1879, in the district court of the United States for the eastern district of New York, a libel was filed against said steam-tug by John Collins, to recover $150, as damages alleged to have been sustained by said Collins, by reason of the running on the rocks off Norwalk, Conn., of his canal-boat, the E. L. Anthony, by said steam-tug; that process on said libel was issued against said steam-tug on said 19th day of March, and was delivered to the marshal of the eastern district of New York, which said process was made returnable April 2d, 1879; that said marshal attached said steam-tug under said process on March 20th, 1879; that no claim was interposed by any one and said steam-tug was left in the custody of said marshal, and on the return day of said process, no one appearing for said steam-tug, a decree was made by said court, entering the default of all persons and directing a reference to compute libellant's damages, and that a venditioni exponas issue to said marshal, and that said steam-tug be sold on six days' notice; that on April 9th, 1879, said writ was issued to said marshal, and after six days' notice of sale duly given, said steam-tug was, on the 17th day of April, 1879, duly sold at public auction by said marshal, and was struck off to this claimant, his being the highest bid therefor; that on the 18th of April, 1879, a bill of sale of said steam-tug was duly executed and delivered by said marshal to this claimant, and was on the same day duly recorded by claimant, in the custom house, in New York City. And said claimant alleges and avers that by said proceedings and sale all liens which accrued prior thereto against said steam-tug were cut off, and that this claimant took said steam-tug free and clear from all liens and among others free and clear from the lien set forth in the libel herein." This answer having been filed, the libellant was allowed to amend his libel by alleging as follows:

"1st. That no final judgment or decree has been had or entered in the proceedings set forth in the answer of the claimant herein as pending in the district court of the United States for the eastern district of New York, wherein one John Collins is libellant and the Steam-tug E. W. Gorgas has been attached.

"2nd. That the district court of the United States for the eastern district of New York did not have jurisdiction over the steam-tug E. W. Gorgas, at the time its process was served upon and the said steam-tug attached in the suit or proceedings aforesaid.

"3rd. That the claimant herein, if he purchased the said steam-tug, E. W. Gorgas, at a judicial sale, as is alleged in the answer, got no title to the said vessel, exclusive of and hostile to the lien of this libellant, nor is this libellant cut off from asserting said lien in this court by reason of any matters set up in the answer of the claimant, because, 1st, the said purchaser and claimant had full knowledge of your libellant's lien against or upon said vessel at the time he purchased her; 2nd, he is and should be estopped as to this libellant's lien upon said vessel from setting up his purchase as aforesaid, because by his own acts and declarations he kept this libellant in ignorance of the proceedings of condemnation and sale aforesaid of the E. W. Gorgas for the purpose of deceiving this libellant and of cutting off his lien by a pretended judicial sale; 3rd, the said sale of the steam-tug E. W. Gorgas was fraudulent, because of the gross inadequacy of the purchase price; 4th, the purchaser, this claimant, was himself personally guilty of and responsible for the tortious act which became the foundation of your libellant's lien as already pleaded in his libel; 5th, the proceedings aforesaid of the said Collins were collusive and fraudulent, and instituted and carried out with the dishonest intention of cutting off your libellant's lien and the liens of other persons in which fraud this claimant was a participant." Upon these pleadings the cause coming on for trial, it was agreed that the issues, raised by the defence of the suit in the eastern district and the sale under it, should be first tried. The claimant offered the record and bill of sale referred to in the answer. The libellants objected to the record and the bill under it, on the ground that the court had no jurisdiction to make the decree because, 1st, the libel was not properly verified; 2nd, the process based on an unverified libel has no validity; 3rd, the return of the process was not signed by the marshal; 4th, the process was not served by the marshal or a deputy marshal, but by one Tobey, who had no authority to serve it, and that therefore there was no seizure of the vessel so as to give the court jurisdiction; 5th, the process being dated March 19th, was made returnable April 2nd, in less than fourteen days exclusive of Sundays; 6th, that it does not appear by the marshal's return that the vessel was seized within the district; 7th, that after the alleged seizure she was not kept in the custody of the marshal till the time of sale.

It appeared that the libel, which was signed by the libellant, had annexed to it the following certificate "Subscribed and sworn to before me this 24th day of February, 1879. Simeon Ford, Notary Public, Kings and N. Y Cos." The objection to this is that, as the notary's seal was not affixed, the court had not before it any competent proof under the laws of the United States, that the libel was sworn to, the certificate of the notary not being attested by his seal. The practice and the rule of the court require a sworn libel previous to the issue of process against the vessel. Martin v. Walker [Case No. 9,170]. By St. 1876, c. 304 [19 Stat. 206], notaries public are authorized to take depositions and do all

other acts in relation to taking testimony to be used in the courts of the United States; take acknowledgments and affidavits "in the same manner and with the same effects" as commissioners of the United States circuit court may now lawfully take or do. This statute differs from some prior statutes relating to the same subject, in that it does not in terms require the signature and authority of the notary to be attested by his official seal. Rev. St. § 1778; Stat. 1874, c. 390, § 20 [18 Stat. 186]. Under this statute, while a court of the United States may doubtless make any reasonable rule to ascertain the authenticity of the notary's signature, as by requiring his seal to be affixed or a certificate of a state officer to his appointment and authority as such notary, yet it would seem that any such evidence in addition to his official signature would be required not to make the act of the notary valid, but simply to satisfy the court of the fact that the certifying officer was a notary; and if the court is satisfied with the official signature of the notary, I do not see how any other court can question the regularity of its action. The seal was not necessary under this statute to a due verification, and if the affixing of the seal were the proper and customary mode of proving to the court the notary's official character, the irregularity of the absence of such proof would not vitiate the process. At most it would be a mere irregularity which cannot be availed of after decree, even in case of a judgment by default.

The objection to the jurisdiction chiefly urged, is that the marshal cannot depute a person who is not a deputy marshal to serve a process directed to him to serve. In this case the marshal signed on the back of the process the following endorsement: "I hereby depute C. W. Tobey to execute the within process." Tobey was not a deputy marshal nor in any way a regular employee of the marshal's office. He had no official connection with the marshal, except so far as this attempted deputation established it for this particular purpose, and he was the person employed by the libellant to procure the libel to be filed and process thereon to be issued. He received the process from the hands of the marshal with this endorsement, and the arrest of the vessel and the service of the notice on the master as required by the rules of that court were made by him. The marshal made return of the process in the usual form as follows: "In obedience to the within monition I attached the steam-tug, etc." It is insisted that this was no arrest of the vessel, and that by admiralty rule 1, of the supreme court, the marshal or deputy marshal alone can, unless in case they are parties in interest, serve the process. That rule provides as follows: "All process shall be served by the marshal or by his deputy, or where he or they are interested, by some discreet and disinterested person appointed by the court." It is also claimed that by

force of Rev. St. § 788, in connection with section 102 of the New York Code of Civil Procedure, the marshal or deputy marshal alone can now serve a process out of an admiralty court in either of the districts within the state of New York, whatever may be the power of the marshal or deputy marshal in other districts to depute another person to do so. Rev. St. § 788 is as follows: "The marshals and their deputies shall have in each state the same powers in executing the laws of the United States as the sheriffs and their deputies in such states may have by law in executing the laws thereof." And the section of the New York Code referred to, provides that "a sheriff or other officer, to whom a mandate is directed or delivered, must execute the same according to the command thereof, and make return thereon of his proceedings under his hand. For violation of this provision he is liable to the party aggrieved for the damages sustained by him, in addition to any fine or other punishment or proceeding authorized by law. A mandate directed and delivered to a sheriff may be returned by depositing the same in the post office, properly inclosed in a post-paid wrapper addressed to the clerk at the place where his office is situated, unless the officer making the return in the name of the sheriff resides in the place where the clerk's office is situated."

It is argued that by Rev. St. § 788, the marshal can exercise no other powers than a sheriff, and that by the Code, section 102, the sheriff cannot depute the execution of a writ.

Independently of any rule of court, or statute affecting this particular duty of the marshal or sheriff, it is clear that such an officer may direct a particular ministerial act, with the performance of which he is charged, to be performed by another, acting for him and under his authority and upon his responsibility. Such is the rule of the common law, and among the ministerial acts which such an officer may so depute another to do in his name and for him, is the service of a writ directed to the sheriff. Hunt v. Burrel, 5 Johns. 137. In that case the under sheriff deputed another person, not an officer authorized by law to serve a writ, to serve a capias, and the question was whether acts done by such person could be justified under the writ. The court held that the service was good, and said: "The deputation was a sufficient authorization to the defendant to execute the writ. The general maxim that 'delegata potestas non potest delegari' is correct, when duly applied; for to make a deputy by a deputy, in the sense of the maxim, implies an assignment of the whole power, which a deputy cannot make. A deputy has general powers, which he cannot transfer; but he may constitute a servant, or bailiff, to do a particular act." And in support of this view the court refer to Parker v. Kett, 1 Ld. Raym. 658, and Leak v. Howel, Cro. Eliz. 533,

and cases therein cited, as showing that the rule is well established at common law. There is no reason why in the absence of restrictive rules or statutes the principle of these decisions should not apply to the marshal or deputy marshal of the United States. Indeed, it is very obvious that they have many duties to perform every part of which they cannot with any convenience to themselves or the public be expected to perform without the aid of other persons; and these authorities are conclusive that there are no reasons of public policy which, independently of rule or statute, except from this class of acts, which such officers may perform by an agent or servant, that part of the service of a monition which consists of the seizure of a vessel under it.

The rule of the supreme court quoted above, does not, in my judgment, have any reference whatever to the regulation of what a marshal must do personally, or what he may do through an agent or special deputy. This and the succeeding rules were framed under St. 1842, c. 188, § 6 (5 Stat. 518), which authorized the supreme court from time to time to prescribe, regulate and alter the forms of writs and other process and other proceedings in the district and circuit courts; and so far as the part of the rule, making it imperative on the marshal or his deputy to serve all process issuing out of the courts of the United States, is concerned, it follows what is the clear implication of the statutes of the United States then existing. St. 1789, c. 20, §§ 27, 28; 1 Stat. 87; Rev. St. §§ 787 and 922, and before the rule was made the supreme court had declared this to be duty of the marshal. Life & Fire Ins. Co. v. Adams, 9 Pet. [34 U. S.] 603. That part providing for the special appointment by the court of a person to serve the process, in case the marshal or his deputy is a party to the cause, is also taken directly from an existing statute (St. 1789, c. 20, § 28, supra). It provides that, in such a case, the court shall appoint a disinterested person to do the service which otherwise under the rule the marshal is to do. Undoubtedly, in such a case, the person so appointed would, by the rule, be required to do all that the marshal would otherwise be required to do under the process, not only to arrest the ship, but to keep it in custody, give the notice required by the monition, and make a return of the process to the court, in his own name. And the "serving of process," as used in this rule, includes all these things. The word "deputy," as used in the rule, clearly means a "deputy marshal," an officer known to the law as such, who equally with the marshal may do all that is to be done under the process. It cannot mean, as used in this rule, a person specially deputed to execute a process or arrest a vessel. It would obviously have been absurd for the supreme court to provide by rule for substituting some other person by special appointment for an interested person

so deputed by the marshal. A deputy marshal is an officer for whose appointment, qualification and removal the laws of the United States expressly provide. Rev. St. §§ 780–782. That the rule of the supreme court now in question has not been understood or construed as restricting the marshal or deputy marshal to a personal performance of this particular duty of arresting a vessel or other act in pursuance of process for the seizure of property, is sufficiently shown by the uniform practice of deputing to particular persons, not regular deputies, the execution of such process, as well since the promulgation of this rule in 1844, as before that time. See U. S. v. Jailer [Case No. 15,463]. This rule is to have the same construction with the statutes, whose meaning it was designed to express and embody in the form of a rule; and the words in which the rule is framed do not express nor indicate any intention to prescribe a new or more limited mode of performing the official duties referred to, or any different manner of executing process from that recognized by the familiar decisions of the courts as a proper and lawful mode of service, by such an executive officer.

Rev. St. § 788 is a re-enactment of St. 1861, c. 25, § 7 (12 Stat. 282), and that again was a re-enactment of St. 1795, c. 36, § 9 (1 Stat. 425). This section of the Revised Statutes differs from these earlier statutes only in the substitution of the words "may have" for the word "have." But for the circumstance that the Revised Statutes is expressly declared to be the re-enactment of laws already in force, this change of phraseology might be construed as conferring on marshals, within the several states, such powers in executing the laws of the United States as by the laws of the same state are from time to time conferred upon sheriffs to execute the laws of the state, making the provision perambulatory; whereas the previous acts had apparently conferred on marshals powers of sheriffs in the like cases as existing at the dates of the said acts respectively. The change of phraseology in this case seems hardly sufficient, however, to overcome the presumption against an intended change of construction in the re-enactment of the statute of 1861, and it would therefore seem that the marshals have, by force of this statute, such powers as sheriffs had on the 29th day of July, 1861, the date of the passage of the last named act of congress. If this view is correct, a restrictive state statute passed in 1877, as the Code of Civil Procedure was, cannot affect the question or be deemed to control or take away any power of the marshal conferred by the act of 1861. But whether the foregoing construction of these laws is correct or not, (and the questions may be regarded as disputable), there are two other answers to the present objection to the power thus exercised by the marshal. The first is, that the statutes of the United States above cited, conferring on marshals similar powers

to those conferred on sheriffs by the state laws, are to be construed as laws conferring powers only, and not as laws restricting or taking away from the marshals any powers already vested in them according to the laws of congress and the rules and practice of the courts, and these statutes cannot be construed as if they provided that the marshals shall, in the execution of the laws of the United States, have only those powers exercised by sheriffs. Not only are these statutes in form simply empowering and not restrictive acts, but the general purpose and objects of the acts of congress, of which they constitute parts, are inconsistent with such a restrictive construction. Both the acts, that of 1795 and that of 1861, were acts passed for the suppression of insurrection and rebellion against the United States. It was not within the purview of such statutes to take away or limit the powers of important executive officers of the United States, however much it was consonant with their general purposes to enlarge those powers. Moreover, there would be such practical inconveniences, and even dangers to public interests, in putting the powers of these federal officers under the regulation of the state legislatures, as a restrictive construction of these acts would do, as to forbid such construction, unless clearly a necessary one. It is, therefore, immaterial whether by the laws of New York sheriffs can now, or in 1861 could, make such a deputation for the service of writs, since, as shown above, the marshals of the United States have, independently of any powers conferred on them by these particular statutes, the power to do so. The other answer to the objection is, that the state statute itself (Code, § 102) seems not to take away from sheriffs the power of deputing other persons to execute process, recognized by statute and the decisions of the courts of New York as an existing power of sheriffs. 1 Rev. St. N. Y. p. 379, § 73, which provides that "persons may also be deputed by any sheriff or under-sheriff by an instrument in writing to do particular acts," has never been expressly repealed. The term "particular acts," clearly includes the service of writs. Hall v. Fisher, 9 Barb. 25; Hunt v. Burrel, ut supra. Indeed, the language of section 102 of the Code of Civil Procedure, relied on as importing that the sheriff or deputy-sheriff must personally serve all process, to wit: "A sheriff or other officer to whom a mandate is directed and delivered must execute the same according to the command thereof, and make return thereon of his proceedings under his hand," is simply a re-enactment of 2 Rev. St. p. 440, § 77, which provides that "every sheriff or other officer to whom any process shall be delivered shall execute the same according to the command thereof, and shall make due return of his proceedings thereon, which return shall be signed by him." This provision seems first to have appeared in the Revised Statutes of 1828, and has been in

force ever since. The changes of phraseology in the Code are merely verbal, and do not indicate a purpose to require the service to be made by the sheriff personally. Moreover, this section, so far as it imposes the duty of serving all process on the sheriff or deputy-sheriff, was implied in 1 Rev. Laws 1813, p. 423, § 10, and that same statute recognized the power of the sheriff to appoint another person, containing the following provision: "That no person who shall be deputed by any sheriff to do a particular act only, shall be required to take the oath to be taken by the deputies of sheriffs." 1 Rev. Laws 1813, p. 421, § 5. The same act also provides (page 423, § 11) that in case resistance is made to any process of execution, the sheriff, "laying aside all other things and taking with him the power of the county, shall forthwith go in his proper person and do execution." This alone would strongly tend to show that in all other cases the sheriff is not required to go in his own proper person for the service of process. At any rate, the existence on the statute book from so early a time of these two provisions, one requiring the sheriff to execute all process, and the other empowering him to do a particular act through a deputy specially appointed in writing therefor, together with the judicial construction that has been put upon the latter provision as applicable under the statute to the service of process, is conclusive that section 102 of the Code has not the force contended for in this case. And it follows that under Rev. St. U. S. § 788, the marshal can make such a special deputation, because under the laws of New York the sheriff can do so. The construction, so clearly to be applied to these statutory provisions of the state of New York, also tends strongly to confirm the views above expressed as to the proper construction of the similar provisions in the statutes of the United States and the rule of the supreme court.

The other objections to the record are not tenable. It is not essential to the jurisdiction that the marshal should continue his custody of the vessel. The Rio Grande, 23 Wall. [90 U. S.] 463. After decree certainly the act of the marshal will so far be presumed to be regular that the seizure will be presumed to have been made within his district, there being nothing to show the contrary. There is no rule or statute requiring the exclusion of Sundays in computing the fourteen days allowed for the return of process. The objection to the signature of the return is not sustained by the evidence. The objections to the jurisdiction must therefore all be overruled, and it is unnecessary to examine the question raised by the claimant's counsel whether the decree itself, importing the judgment of the court upon these several questions and a finding of the facts in favor of the jurisdiction, does not exclude all evidence impeaching the jurisdiction on these several grounds.

It remains to consider whether the alleged fraud and collusion constitute any ground on which, in this suit, the decree or the title made under it can be attacked.

As regards the allegations of fraud in procuring the title of the claimant under the decree, the averments of the amended libel are not sufficiently certain to make it proper to dispose of the issue on the offers of proof already made. There is a considerable weight of authority for the claim that even a domestic judgment in rem may be treated as a nullity when made the basis of a claim or defence by one who has procured it by means of a fictitious case imposed upon the court, or even by means of a case not in itself fictitious but used not for the benefit of the apparent plaintiff, but collusively with him for the benefit and defence of the party apparently hostile to him, and with a purpose on his part to injure or impair the rights of the party against whom the judgment is sought to be now set up as a bar. Borden v. Fitch, 15 Johns. 145; 2 Smith, Lead. Cas. (7th Am. Ed.) p. 822. See, also, Bradstreet v. Neptune Ins. Co. [Case No. 1,793]; The Storm King [Id. 13,491]; Girdlestone v. Brighton Aquarium Co., L. R. 3 Exch. Div. 137, and same case on appeal, L. R. 4 Exch. Div. 107. Whether, however, the libellants' case can be brought within this principle and what are the proper limits of the principle itself, may more properly be left to be determined when the libellants have produced all their evidence tending to show fraud and collusion.

The cause will stand for further hearing on the issue of fraud and collusion.

Evidence having been taken on that issue, the court rendered the following opinion:

CHOATE, District Judge. The testimony having been now taken bearing on the questions of fraud raised by the libellants in impeachment of the title under the marshal's bill of sale, set up in the answers of the claimant, it is evident that no case is made out by the libellants for holding that the suit of Collins against the E. W. Gorgas was a fictitious suit or was procured to be commenced or carried on by the consent or with the connivance of libellant therein, for the benefit of any other party than himself. So far as the libellant Collins is concerned, the suit was prosecuted in good faith, for the purpose of collecting what he believed to be a valid claim, and all the steps taken in his name and behalf in the progress of the cause were taken in pursuance of his directions given to his proctors and the agent employed by him to collect the claim. It is, however, now insisted that the claimant George H. Dentz has been guilty of such a fraud towards the libellants in respect to said suit, and the sale of the tug under the decree therein, that he is estopped to deny their liens as still existing, notwithstanding the sale of the boat to him under the decree. It is also claimed on their

behalf that a sale under a decree of an admiralty court to one who was the former owner of the vessel does not cut off the prior liens created through the acts or contracts of such owner, and that the same principle makes the title of the claimant, who was the master of the tug and representative of the owner at the time when the libellants' liens, if they ever had any, attached, subordinate to their liens. And it is insisted that the rule applies to such a case that the same person cannot be both vendor and vendee.

As regards this latter point, it seems to me enough to say that a sale of a vessel by a court of admiralty, if properly subject to its jurisdiction, is a sale of the thing itself and not a transfer of anybody's title to it. A transfer by the marshal under the decree becomes a new and independent source of title, and all rights in and liens upon the thing sold are transferred and attach to the proceeds in the possession of the court. It differs essentially from a sale inter partes and from other judicial sales where the court undertakes to deal with and transfer only the interest or title of particular persons, parties to the suit before it. And there is no reason of public policy which incapacitates a former owner from buying at an admiralty sale on the same terms as regards the title he acquires with all the rest of the world. Indeed, sales in admiralty are so often submitted to, in practice, for the purpose of disentangling the title to the vessel from embarrassing claims and liens, and vessels so sold have been so frequently purchased by their former owners that this point, if valid, must long ago have been raised and sustained. There is no question that the former owner may buy and all existing liens will be cut off by the sale. Nor does this claimant stand in any worse position as a purchaser than any other person because he was master of the tug at the time libellants' boats were lost. Their claims against the tug, if any, are based wholly on the negligence of those in charge of the boat at the time of the disaster. He was then the master and presumptively the negligent party, if negligence shall be proved. But this fact does not establish any relation of trust and confidence between him and them such as to make it improper for him to become a purchaser with all the rights of any other purchaser.

The point of an equitable estoppel is, however, now chiefly relied on by libellants' counsel. The circumstances insisted on as creating this estoppel are, that the claimant being liable personally, as master of the tug, to the libellants for their claims, suffered the proceedings in the Collins suit to go on to a condemnation and sale, when he might have defended it, or might have settled the claim; and kept the libellants in ignorance of the proceedings till after the sale, misleading them through promises of payment which he did not intend to perform, so that they deferred libelling the boat till after the sale,

whereas but for such promises they would, it is claimed, have libelled her before the sale, and would have discovered the pendency of the Collins suit, appeared therein and contested the claim, or attended the sale and given or procured to be given a higher price; that by these means and other practices designed to secure secrecy, they were prevented from getting information of the sale and so of protecting their interests by bidding at the sale; that these other practices were chiefly the procuring of the sale to be made at an unusual place and the procuring of the consent of the marshal that pending the sale, no keeper should be put on board, and that the boat should remain in the possession of the claimant, making its usual trips about the harbor and in Long Island Sound.

No case for the application of the doctrine of equitable estoppel is made out against the claimant. He was not under the slightest obligation to inform the libellants of the pendency of the suit of Collins, or of the sale which was about to take place. He had a perfect right to allow the Collins case to go on to a decree and sale, even if he might have settled it; and it was no act of bad faith toward other persons having liens on the tug, if he did so with the intention of buying her at the sale clear of their liens. There is no proof that the claim of Collins could have been successfully defended. The arrangement with the marshal for dispensing with a keeper seems to have been made from merely economical considerations, security being given to the marshal that the tug would be produced at the time and place fixed for the sale if the suit was not settled. The place of sale was a proper place, in the absence of any established or usual place for marshal's sales. Some inadequacy of price is shown, and it is probable that, upon a re-sale and with extraordinary efforts to obtain purchasers the tug might bring from a thousand to fifteen hundred dollars, instead of five hundred and fifty dollars for which she was bid off by the claimant. The alleged promises of the claimant to pay libellants' claims are denied by him, and do not seem probable under all the circumstances of the case; but, if made and if they were designed on the claimant's part to lull the libellants into a false security so that they forebore taking measures against the tug which would probably have led them to a discovery of the impending sale, it is not shown that by reason of these promises even in this indirect way they have lost their liens, or that they have suffered any damage as lienors which could not and would not, on their application in that suit, have been remedied. No misstatement of fact was made or is claimed to have been made to them by the claimant. Their liens are cut off by operation of law, by regular proceedings of a court of competent jurisdiction in a suit to which they and all the world having any claim on this vessel were parties. If their interests have been unduly sacrificed and their default

in not appearing was excusable, that court had full power on their application to give them relief. No other court can so well give the relief to which they may be entitled. It is said that the claimant has obtained his title through this fraud. If it be in any sense a fraud, it is not true that the claimant obtained his title through or by means of it, but he did obtain his title through the judgment and decree of the court. It does not satisfactorily appear that if what is called his fraud had not existed, the claimant would not equally and on the same terms have obtained the same title. To hold that the liens of the libellants are not cut off would be to put them in a better position than they were in before the alleged wrong, when their claims were subordinate to that of Collins, and would virtually be setting aside the decree and proceedings of the district court in the eastern district by reason of alleged improper practices of one party to a suit in that court towards another party to the same suit. It would be inflicting a punishment for fraud without regard to the damage caused by the fraud. The libellants might have applied to the court for leave to contest Collins's claim at any time before the distribution of the fund in court, the proceeds of the vessel, and it appears that they knew of the proceedings within two days after her sale. If the sale was unfair, or for a grossly inadequate price, or would have been for a higher sum if they had had actual notice of it, they could have applied for a re-sale. But they have suffered no legal damage in not having an opportunity to buy the tug in themselves.

It is a general principle applicable to equitable estoppels, that equity will not carry them beyond indemnity to the party who has been misled. The only deceit which can be claimed to have been made out in this case is that by his acts and declarations the claimant led the libellants to understand that there was not, so far as he knew, any proceeding in admiralty pending against the tug which might result in their liens being cut off by a judicial sale in such suit. This is the utmost that can be made of the evidence, giving it the most favorable construction for the libellants. And the entire immediate resulting damage to them from this so-called deceit, was that they were led thereby not to take measures which would have informed them of the proceedings, and therefore suffered themselves to be in default in that suit. But the remedy and the duty of a party who is in default, if the default is excusable, or induced by the deceitful practice of another party to the cause, is to get out of default as soon as he can, and not to lie by till the injury that may result from his default, and which by application to the court he might prevent, has been sustained, and then throw the entire loss on the other party to the suit by whom he has been misled. It would certainly be a novel application of the doctrine of equitable estoppel for another court to

hold that the proceedings of the court in the suit where the party was so in default are not to have their full, usual and legitimate effect when that party has not even made application to that court to relieve him against his default. And if such application is made, it must be assumed that the party will obtain all the relief to which he is entitled. It is not to be overlooked that whatever the claimant may have done to mislead the libellants, they had all the notice of that suit which the law in like cases gives to lienors, and that they are in any view parties in default, and it cannot be complained, therefore, on their behalf that their application to that court for relief would necessarily be granted on terms usual in cases of default.

I do not think that the acts and declarations of the claimant were such as to amount to a statement by him to the libellants that there was no such suit pending; but if it were, while it would constitute a strong case for relief in that court, it would not, in my opinion, justify the application of the doctrine of equitable estoppel for two reasons: First, because an estoppel is raised only where it is necessary to prevent a loss or injury resulting from the reliance on the statement of the party estopped, and it is not so necessary if in the suit to which the statement refers he has or is entitled to full relief; and secondly, because an estoppel is applied only to the extent required for the indemnity of the party deceived, and to hold the claimant's new title, as is contended for, subject to the libellants' liens, without regard to the antecedent rights and liens to which they were subordinate, and which have been cut off by the decree and sale, would carry the estoppel far beyond such rule of indemnity.

The defence is sustained and claimant is entitled to decrees dismissing the libels.